# IN THE COURT OF APPEALS OF IOWA

No. 25-1570
Filed December 17, 2025

IN THE INTEREST OF J.M. and S.A.,
Minor Children,

R.A., Father,
    Appellant,

M.M., Mother,
    Appellant.

_____

Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

The mother and father separately appeal the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Annette F. Martin, Cedar Rapids, for appellant father.

Alexander S. Momany of Howes Law Firm, PC, Cedar Rapids, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Robin L. Himes of Linn County Advocate, Cedar Rapids, attorney and guardian ad litem for minor children.

Considered without oral argument by Tabor, C.J., and Badding and Sandy, JJ.

**TABOR, Chief Judge.**

The juvenile court's first duty is to protect the best interests of the children in its jurisdiction.[1]  However difficult the obstacles are for the parents to resume custody, the court cannot return children to an unsafe situation.  Against those fundamentals, the parents here separately appeal the termination of their parental rights.[2]  Because neither parent can safely raise their respective children, we affirm.[3]

## I.     Facts and Background Proceedings

M.M. is the mother of four children.  In early 2024, nine-year-old J.M. and three-year-old S.A. lived with her in Cedar Rapids.  M.M.'s other two children lived with family members.  That April, M.M. attended a doctor's appointment for S.A., who has cerebral palsy and was then twenty-one months old.  An eyewitness reported to police that M.M. was "screaming and swearing" at S.A. and had turned over her car seat so that the toddler fell out face first.  M.M. pleaded guilty to child endangerment and received a deferred judgment.  But fifteen months later at the trial to terminate her parental rights, M.M. testified she didn't hurt S.A. and only accepted the plea agreement because she didn't want to go to jail.

---

[1] "[T]he paramount concern that guides all matters arising out of [child-in-need-of-assistance] and termination of parental rights proceedings [is] the best interests of the child." *Iowa Dep't of Health & Hum. Servs. v. Iowa Dist. Ct.*, 27 N.W.3d 76, 83 (Iowa 2025).

[2] M.M. is the mother of both S.A. and J.M.  R.A. is S.A.'s father.  The juvenile court also terminated the parental rights of putative fathers of J.M.

[3] We review termination-of-parental-rights proceedings de novo.  *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018).  "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (citation omitted).

After their mother was arrested, the court removed S.A. and J.M. from M.M.'s custody. S.A.'s father R.A., who lives in Georgia, was unable to travel to Iowa and assume custody. So the Iowa Department of Health and Human Services placed S.A. and J.M with their aunt. But after learning that the aunt allowed M.M. to have unauthorized contact with the children, the department moved them to a foster home. In June 2024, the court ordered M.M. to address her mental-health and substance-use issues, drug test four times per month, and undergo medication management and therapy for her mental-health needs. It also ordered an Interstate Compact on the Placement of Children (ICPC) study on R.A.'s home in Georgia.

By the termination trial one year later, M.M. showed little progress toward being a more stable parent. Her employment and housing were unstable. On the first day of the trial, she was unemployed and living with her pastor. On the second day of trial, one week later, she didn't appear but her attorney reported she had been kicked out of the pastor's home and moved to Illinois. The department case manager testified it was difficult to provide services because M.M.'s phone number changed often. The quality of her parenting at supervised visits was mixed. At some visits, she was very inactive. Once the supervisor had to end the visit early because M.M. did not bring appropriate food. The department suspended visitation when M.M. had an outburst in front of the children, threatening the foster family and the judge.

M.M. also didn't address her mental-health and substance-use challenges. According to the department, she was asked to drug test sixty-seven times and tested twice. Both tests were positive for marijuana. As for her mental health,

M.M. had been diagnosed with schizophrenia, bipolar disorder, ADHD, and PTSD, but she didn't "believe" those diagnoses. She refused medication because she didn't want to be "drugged up." And she testified her mental-health struggles did not affect her parenting. By the termination trial, she had attended just one therapy session.

R.A. had sparse involvement in S.A.'s life. In fact, he had only seen his daughter in person once. He testified that he calls and video chats weekly, but the foster parents reported these interactions were less frequent. He also testified that he sent money and clothes for S.A., but the foster parents recalled that happening only twice. The case manager agreed S.A. knows R.A. is her father because of their phone contact. Yet the manager did not believe that terminating the father's rights would cause S.A. significant trauma because they had no real parent-child relationship. On top of that, the ICPC report on R.A.'s home was denied when his drug screen was positive for alcohol and marijuana; yet R.A. testified that he had not used marijuana for several months. R.A.'s attorney asked for more drug testing, but the case manager had not yet set that up with the state of Georgia.

On the other hand, R.A. has custody of S.A.'s sister, E.A., who was one year older. His daycare provider and family friends testified that he is a safe and attentive single parent. He has a job as an HVAC technician, a car, and family health insurance. R.A. has been in his own apartment for several months. His mother and his godmother provide back-up care for E.A. when R.A. is working or attending classes at a local college. R.A. testified he wants to raise both his daughters and believes S.A. should be placed with her full sibling.

But the department rejected that prospect. The case manager testified while S.A. has scarcely met E.A., she is strongly bonded with her half-brother J.M. And their current placement in Iowa has the potential to be a permanent home for both children. The current foster family has developed a strong attachment with the children, who have been in their care only since May 2025.

The juvenile court terminated M.M.'s parental rights to J.M under Iowa Code section 232.116(1), paragraphs (e) and (f) (2025) and to S.A. under paragraphs (e) and (h). And it terminated R.A.'s rights to S.A. under paragraphs (e) and (h). The parents appeal separately.

## II. Discussion

We review termination proceedings in three steps. *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). First, we evaluate whether the State has proven a statutory ground for termination under Iowa Code section 232.116(1). *Id.* Second, we assess whether termination is in the children's best interests under section 232.116(2). *Id.* Third, we consider whether any exceptions in section 232.116(3) preclude termination. *Id.*

### A. Mother's Appeal

M.M. challenges the first and third steps of the termination analysis.

On the first step, "we may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence." *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010); *see* Iowa Code § 232.116(1)(a)–(p). Here, we focus on paragraphs (f) and (h). M.M. challenges only the common final element of those grounds, requiring clear and convincing evidence that the child cannot be returned to parental custody at the time of the termination hearing as provided in

section 232.102.[4]  *See* Iowa Code § 232.116(1)(f)(4), (h)(4); *In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (finding "at the present time" means the date of the termination hearing).  She asserts that she obtained a mental-health evaluation as ordered and engaged in mental-health services.  She chose not to take medications because she didn't like the side-effects.  And she argues that she maintained employment through the proceedings.

But our reading of the record reveals M.M.'s instability and lack of engagement with services fail to make her a safe parent.  Between the two hearing dates, she had lost her housing and moved out of state.  She took only minimal steps to address her substance-use and mental-health struggles, resisting medication for serious impairments, attending only one therapy session, and refusing most drug-testing requests.  She was also still testing positive for marijuana.  And she failed to see how either her substance use or her mental-health conditions affected her parenting.  Despite pleading guilty to child endangerment for flipping her child's car seat, M.M. denied hurting S.A.  And while she was frustrated and sad about the removal of her children, she agreed she didn't follow court orders to enable reunification.  Bottom line, the children would

---

[4] Our caselaw offers two formulations for what it means when a child "cannot be returned" to parental custody as provided in section 232.102, which discusses transferring the child's custody if staying in the home would be "contrary to the welfare of the child."  Many cases cite *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992), which provides a child cannot be returned if it would expose him or her to "any harm amounting to a new child in need of assistance adjudication."  But our supreme court often describes the fourth element as the inability to "safely return" children to their parents' custody.  *See, e.g., In re T.W.*, No. 20-0145, 2020 WL 1881115, at *2–3 (Iowa Ct. App. Apr. 15, 2020) (collecting cases).  Under either formulation, the State met its burden of proof here.

not be safe if returned to her custody. We agree with the juvenile court that clear and convincing evidence supports this ground for termination.

Next, M.M. contends that a statutory exception applies to prevent termination because she and the children share a close bond. *See* Iowa Code § 232.116(3)(c) (providing the court need not terminate parental rights on clear and convincing evidence that doing so "would be detrimental to the child at the time due to the closeness of the parent-child relationship"). The case worker agreed that M.M. is bonded to the children, and they love her. But M.M. presents no evidence that the children "will be disadvantaged by termination" or that "the disadvantage overcomes" her parenting deficiencies. *D.W.*, 791 N.W.2d at 709. She has not shown sufficient evidence to apply this exception.

### B. Father's Appeal

R.A. challenges only the first step of the termination analysis, contending there was insufficient evidence to support the statutory grounds for termination. *See* Iowa Code § 232.116(1)(e), (h). R.A.'s petition on appeal focuses on paragraph (e), but we choose to analyze paragraph (h). *See D.W.*, 791 N.W.2d at 707. R.A. does not identify how the State's proof fell short on that ground.[5] But

---

[5] Because R.A. includes no analysis that the statutory ground under paragraph (h) wasn't met, we could deem the argument waived. *See, e.g.*, *In re K.K.*, No. 16-0151, 2016 WL 1129330, at *1 (Iowa Ct. App. March 23, 2016). But we choose to address it. In passing, R.A. also mentions "best interests" and the statutory exceptions under section 232.116(3). Because he advances no substantive argument, we do not address either of those steps. *See In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) (holding broad or vague arguments do not merit review); *A.S.*, 906 N.W.2d at 475 (holding parent resisting termination bears burden of proof under section 232.116(3)).

elsewhere in his petition, R.A. points to his stable home, income, and successful parenting of S.A.'s sister.

We recognize that R.A. has custody of his other daughter. But the ICPC study was denied because his drug screen was positive for marijuana and alcohol. And while R.A. testified he hadn't used marijuana in several months, the test came back positive in June. We also understand it is costly and difficult to visit Iowa from Georgia. But S.A. has been out of parental custody for fifteen months, and R.A. had only seen her in person once.[6] True, she calls R.A. "Dad" over the phone, but they have no relationship beyond that. In addition, S.A. has a complex medical condition, and R.A. has never attended her medical appointments or demonstrated that he could handle her health needs while also caring for another preschooler. The statutory timeframe to show he can assume custody of this child has run. *See* Iowa Code § 232.116(1)(h)(4). The case worker testified that the department could not recommend that S.A. be united with her father in Georgia because the department had never seen him perform parenting skills. On this record, we find the State offered clear and convincing evidence that S.A. could not be returned to her father's custody at the time of the termination hearing.

**AFFIRMED ON BOTH APPEALS.**

---

[6] The juvenile court found that R.A. "chose to use the geographical distance as an excuse to not engage in services or make any progress toward reunification with his child."